IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN AND PATRICIA CONN                                          PLAINTIFFS

V.                                           CAUSE NO. 3:10-CV-00300-CWR-LRA

UNITED STATES OF AMERICA                                        DEFENDANT

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

In Mississippi, "[t]he success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiff's selected medical expert,"[1] because "[t]he expert must articulate an *objective* standard of care."[2] If that expert fails to do so, then summary judgment must be granted in favor of the defendant. That is the situation that finds itself before this Court today.

## FACTS

**Conn's Heart Attack.** On February 10, 2009, John Conn was suffering from chest pains. He first visited the Stone County Hospital but soon transferred to the G.V. "Sonny" Montgomery V.A. Medical Center in Jackson, Mississippi (hereinafter "the V.A."). By the time he arrived at the V.A., Conn's chest pains had subsided, but he "had a troponin I value of 0.17 and some nonspecific EKG changes."[3]

---

[1] *Estate of Northrop v. Hutto*, 9 So. 3d 381, 384 (Miss. 2009).

[2] *Id.* (emphasis added).

[3] Exhibit 2 to Motion for Summary Judgment [Docket No. 46-2] (hereinafter "Government Exhibit 2") at 2.

That afternoon, an EKG showed an "[i]ncomplete [r]ight bundle branch block."[4] The V.A.'s records noted to "[c]onsider ECHO in the AM."[5]

The V.A. kept Conn overnight for observation, and during the night, his "[t]roponin I began to trend down[,] and Conn had no episodes overnight on telemetry monitoring."[6] Conn related to the V.A. that he had undergone a stress test the prior year, and he "was placed on omeprazole 40 mg po for possible GERD."[7] The V.A. discharged Conn after a one-night stay and recorded that he was "asymptomatic."[8] He never underwent an ECHO test.[9]

Unbeknownst to Conn or the V.A., Conn had a 90-percent blockage in his left descending artery. Two days later, Conn returned to the Stone County Hospital with chest pains.[10] He suffered a massive heart attack and had "to be shocked back to life after flat lining in the emergency room."[11]

**Conn's Expert Report.** In time, Conn and his wife filed suit against the United States government for medical malpractice.[12] As part of that suit, Conn submitted his medical records to

---

[4] Exhibit 3 to Response to Defendant's Motion for Summary Judgment [Docket No. 48-3] (hereinafter "Conn Exhibit 3").

[5] Conn Exhibit 3.

[6] Government Exhibit 2 at 2.

[7] Government Exhibit 2 at 2.

[8] Government Exhibit 2 at 2.

[9] *See supra* at n.5.

[10] Government's Brief at 2.

[11] Conn's Brief at 2.

[12] Complaint [Docket No. 1].

Dr. Mark Strong, who reviewed the records and submitted an expert report.[13] According to Dr.

Strong, Conn's elevated troponin levels and irregular EKG readings leave "no question that Mr.

Conn suffered an acute myocardial infarction the morning of 2/10/09."[14]

In light of that condition, Dr. Strong wrote that the V.A.'s course of treatment was "not

appropriate."[15] In particular, Dr. Strong took note that Conn "did not receive any type of beta-

blocker therapy, anti-platelet therapy or thrombin inhibitor" at the V.A., nor did Conn "receive

any type of vasodilator therapy/nitrate therapy."[16] Even after the V.A. confirmed Conn's elevated

troponin level, Dr. Strong contends that Conn "was not treated with what the American College

of Cardiology, American Heart Association recommend for an acute myocardial infarction."[17]

According to Dr. Strong, the "most concerning aspect"[18] of Conn's stay at the V.A. was

the nature of his discharge from the facility. Dr. Strong wrote:

> The discharge diagnosis and discharge medications fail to address, account for or treat what is clearly documented by EKG, lab value and clinical history to be an acute myocardial infarction. *My professional recommendation* given his documented medical course would have been to proceed with diagnostic coronary angiography. At the least, there should be been some type of pre-discharge risk stratification to assess Mr. Conn's risk of suffering recurrent angina, a second myocardial infarction or further complications from his acute myocardial infarction.[19]

---

[13] Exhibit 1 to Conn's Brief [Docket No. 48-1] (hereinafter "Dr. Strong's Report").

[14] Dr. Strong's Report at 1.

[15] Dr. Strong's Report at 1.

[16] Dr. Strong's Report at 1.

[17] Dr. Strong's Report at 1.

[18] Dr. Strong's Report at 2.

[19] Dr. Strong's Report at 2 (emphasis added).

Ultimately, Dr. Strong opined that "the failure of the medical staff at the [V.A.] to appropriately diagnose, treat and risk stratify Mr. Conn following his admission for an acute myocardial infarction on 2/10/09 left him with an unacceptably high risk of recurrent symptoms and complications of angina/myocardial infarction and death."[20] Dr. Strong concluded that Conn's "underlying coronary artery disease . . . was clearly evident and should have been diagnosed on 2/10/09."[21]

## ANALYSIS

**Controlling Law.** The Government moved for summary judgment[22] on June 15, 2012. Specifically, the Government argues that Dr. Strong's report fails in three respects: that it offers no standard of care, that it does not show that the V.A. breached the standard of care, and that it does not establish that the breach caused Conn's injuries. The first point is dispositive, and therefore, this opinion does not reach the second and third arguments.

Negligence suits against the federal government are controlled by the Federal Tort Claims Act, and they are evaluated "in accordance with the law of the place where the act or omission occurred."[23] Therefore, this suit is governed by Mississippi law's view of medical malpractice.

In Mississippi, a plaintiff in a medical malpractice case must prove, among other things,

---

[20] Dr. Strong's Report at 2.

[21] Dr. Strong's Report at 2.

[22] Motion for Summary Judgment [Docket No. 46].

[23] 28 U.S.C. § 1346(b)(1).

that a standard of care governed his physician's actions.[24] The standard of care must be "specific,"[25] and at its core, it is a requirement that a physician be "minimally competent"[26] in his practice.

According to the Government, Dr. Strong's report attempts but fails to establish a standard of care at three separate points. First, in the Government's view, Dr. Strong's reliance on "what the American College of Cardiology, American Heart Association recommend for an acute myocardial infarction"[27] merely represents "the standard suggested by one group of cardiologists"[28] and does not state an objective standard of care. Second, the Government argues that Dr. Strong's report mistakenly attempts to delineate a standard of care by explaining "what his personal treatment choices may have been."[29] And third, the Government contends that Dr. Strong's report is vague.

Conn disagrees. Conn recounts the portions of Dr. Strong's report that discuss the V.A.'s decision not to use beta-blocker therapy, its failure to order a diagnostic coronary angiography, and its failure to adhere to the recommendations of the American College of Cardiology and the

---

[24] *Estate of Northrop v. Hutto*, 9 So. 3d 381, 384 (Miss. 2009). This element, like all elements of a medical malpractice case, must be satisfied by expert testimony. *Coleman v. Rice*, 706 So. 2d 696, 698 (Miss. 1997).

[25] *Patterson v. Tibbs*, 60 So. 3d 742, 753 (Miss. 2011).

[26] *Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993).

[27] Dr. Strong's Report at 1.

[28] Government's Brief at 4.

[29] Government's Brief at 4.

American Heart Association.[30]

**Portions of Dr. Strong's Report are Personal Recommendations and Vague.** A review of Dr. Strong's report reveals several portions that correspond to the Government's second and third attacks. Dr. Strong's first criticisms of the V.A.'s actions appear in his report's fourth paragraph, where he attacks the V.A.'s decision not to order "any type of beta-blocker therapy, anti-platelet therapy or thrombin inhibitor," nor "any type of vasodilator therapy/nitrate therapy."[31] But Dr. Strong never reports that such decisions would have marked the course of action of a minimally competent physician; he merely lists them as actions not taken.

Likewise, in his report's fifth paragraph, Dr. Strong writes that "[t]he discharge diagnosis and discharge medications fail to address, account for or treat what is clearly documented by EKG, lab value and clinical history to be an acute myocardial infarction." Dr. Strong might be correct, but simply claiming that the V.A. "fail[ed] to address, account for or treat" Conn's condition does not establish a standard of care with specificity.[32]

The remainder of the fifth paragraph is similarly imprecise. Dr. Strong writes, "My professional recommendation given [Conn's] documented medical course would have been to proceed with diagnostic coronary angiography."[33] The Mississippi Supreme Court has held that

---

[30] Conn's Brief at 2.

[31] Dr. Strong's Report at 1.

[32] *See Patterson*, *supra* at n.31.

[33] Dr. Strong's Report at 2.

an expert's personal recommendations do not amount to a standard of care.[34] Therefore, Dr.

Strong's "professional recommendation" to order a diagnostic coronary angiography does not

satisfy Mississippi law. Likewise, Dr. Strong's insistence that "[a]t the least, there should have

been *some type* of pre-discharge risk stratification"[35] is far more imprecise than the "specific"

statement required by Mississippi law. And the report's conclusion that Conn suffered his

injuries because of the V.A.'s "failure . . . to appropriately diagnose, treat and risk stratify Mr.

Conn"[36] is extremely vague. None of these statements enunciates a *specific* course of action that a

minimally competent physician would have taken to treat Mr. Conn.

**Dr. Strong's Reliance on Clinical Practice Guidelines.** Casting aside these portions of

Dr. Strong's report leaves only his contention that Conn "was not treated with what the American

College of Cardiology, American Heart Association recommend for an acute myocardial

infarction."[37] The Government claims that this statement does not establish a national standard

of care; Conn disagrees. Neither party offers any authority in support of its position.

Research reveals that the American Heart Association and the American College of

Cardiology Foundation jointly publish a series of Guidelines for different aspects of cardiac

medicine. For example, the two groups recently published a set of performance measures for

---

[34] *Estate of Northrop v. Hutto*, 9 So. 3d 381, 387 (Miss. 2009) (holding that an expert's
"personal preference does not establish a national standard of care"). The expert "must articulate
an *objective* standard of care." *Id*. at 384 (emphasis added). Otherwise, such a personal opinion is
nothing more than "inexpert" opinion. *Burton v. United States*, 668 F. Supp. 2d 86, 100 (D.D.C.
2009).

[35] Dr. Strong's Report at 2 (emphasis added).

[36] Dr. Strong's Report at 2.

[37] Dr. Strong's Report at 1.

adults with heart failure. The series also contains Guidelines regarding percutaneous coronary

intervention, coronary artery bypass graft surgery, management of patients with atrial fibrillation,

and a host of other topics.[38] These publications are not simple "how-to" checklists regarding the

practice of medicine; in length and scope, they resemble law review articles. For example, the

2011 ACCF/AHA Guideline for Coronary Artery Bypass Graft Surgery[39] is 83 pages long.

The breadth of the Guidelines series and the depth of each publication raise two obvious

problems with Dr. Strong's claim that Conn "was not treated with what the American College of

Cardiology, American Heart Association recommend for an acute myocardial infarction."[40]

First, Dr. Strong does not identify a specific publication within the Guidelines series. Therefore,

it is impossible to tell which set of recommendations he claims the V.A. failed to live up to.

Second, even if Dr. Strong had identified one particular publication, it is doubtful that he would

satisfy Mississippi law: an enunciated standard of care must be "specific," and each Guidelines

publication probably contains dozens, if not hundreds, of recommendations.

But more fundamentally, Conn's reliance on the Guidelines implicates an issue arising

more and more often in the nation's courts: whether the ACCF/AHA Guidelines, or any other set

of published clinical practice guidelines, can establish a national standard of care in a medical

---

[38] *See* AAC/AHA Joint Guidelines, American Heart Association, http://myamericanheart.org/professional/StatementsGuidelines/ACCAHA-Joint-Guidelines_UCM_321694_Article.jsp (last visited July 9, 2012).

[39] ACF/AHA Practice Guideline: 2011 ACCF/AHA Guideline for Coronary Artery Bypass Graft Surgery, American Heart Association, http://circ.ahajournals.org/content/124/23/e652.full (last visited July 9, 2012).

[40] Dr. Strong's Report at 1.

malpractice lawsuit. To put it mildly, the question does not enjoy a consensus answer.[41]

On one hand, several courts have considered clinical practice guidelines in favorable lights, and not solely for the purpose of establishing a standard of care. In 2006, a federal court in New York permitted a defendant to offer clinical practice guidelines to establish the appropriate standard of care.[42] In 2010, another New York district judge favorably mentioned the Guidelines within a discussion of the standard of care.[43] And in 2001, a federal judge in New Jersey considered an expert report that relied on guidelines published by the American Heart Association.[44]

Other courts, including one district judge in this Circuit, view these publications as "just

---

[41] *See generally* Arnold J. Rosoff, *The Role of Clinical Practice Guidelines in Healthcare Reform: An Update*, 21 Annals Health L. 21 (2012); Carter L. Williams, *Evidence-Based Medicine in the Law Beyond Clinical Practice Guidelines: What Effect Will EBM Have on the Standard of Care?*, 61 Wash. & Lee L. Rev. 479 (Winter 2004); Michelle M. Mello, *Of Swords and Shields: The Role of Clinical Practice Guidelines in Medical Malpractice Litigation*, 149 U. Pa. L. Rev. 645 (Jan. 2001).

[42] *Gerace v. United States*, No. 5:03-cv-166 (NPM/GHL), 2006 WL 2376696, *24-25 (N.D.N.Y. Aug. 10, 2006) (McCurn, J.).

[43] *Dannenberg v. United States*, No. 04-cv-4897 (NGG)(JMA), 2010 WL 4851341, *6-7 (E.D.N.Y. Nov. 22, 2010) (Garaufis, J.).

[44] *Lasser v. Reliance Standard Life Ins. Co.*, 130 F. Supp. 2d 616, 622 (D.N.J. 2001) (Wolin, J.). *See also Hinlicky v. Dreyfuss*, 6 N.Y.3d 636, 648, 848 N.E.2d 1285 (2006) (permitting defense to use Guidelines as non-hearsay demonstrative evidence but not reaching question of "whether evidence may become admissible solely because of its use as a basis for expert testimony" under New York law).

guidelines"[45] and have held that they do not establish a standard of care.[46] Similarly, the New

York Court of Appeals wrote in 2002 that clinical practice guidelines "merely recommend"

certain actions and "are not rules."[47] And some 20 years ago, the Pennsylvania Supreme Court

deduced that the volume of clinical practice guidelines circulating throughout the medical

community demonstrated that guidelines could not, in and of themselves, establish a standard of

care because their conflicts showed "two schools of thought" in the medical community.[48]

So far as research indicates, neither the Mississippi Court of Appeals nor the Mississippi

Supreme Court has explored this subject.[49] But a 1997 concurring opinion on the subject by a

Tennessee Court of Appeals judge is particularly compelling. In *Frakes v. Cardiology*

*Consultants, P.C.*,[50] then-Judge Koch[51] wrote separately to describe clinical practice guidelines as

---

[45] *Estate of LaFarge ex rel. Blizzard v. Kyker*, No. 1:08-cv-185, 2011 WL 6151595, *3 (N.D. Miss. Dec. 12, 2011) (Aycock, J.).

[46] *Porter v. McHugh*, - - - F. Supp. 2d - - -, 2012 WL 1003510, *3 (D.D.C. March 27, 2012) (simply citing to guidelines "fall[s] short of establishing a clearly defined national standard of care").

[47] *Diaz v. New York Downtown Hosp.*, 99 N.Y.2d 542, 545, 784 N.E.2d 68 (2002).

[48] *Levine v. Rosen*, 532 Pa. 512, 518-19, 616 A.2d 623, 628 (1992). *See also Greathouse v. Rhodes*, 242 Mich. App. 221, 227-28, 618 N.W.2d 106, 109 (2000) (plaintiff not permitted to use Guidelines as learned treatise to establish standard of care) (*rev'd on other grounds*, *Greathouse v. Rhodes*, 465 Mich. 885, 636 N.W.2d 138 (Mich. 2001)).

[49] *But see Causey v. Sanders*, 998 So. 2d 393, 401 (Miss. 2008) (affirming in part jury verdict in which an expert witness "conceded that it would be a direct violation of the Hospice guidelines to hasten any patient's death and that if titration of medication by a hospice led to a person's death, that action would be a breach in the standard of care for a hospice setting").

[50] *Frakes v. Cardiology Consultants, P.C.*, No. 01-A-01-9702-cv-00069, 1997 WL 536949 (Tenn. Ct. App. Aug. 29, 1997).

[51] Hon. William C. Koch, Jr., is now an associate justice on the Tennessee Supreme Court.

"consensus standards of conduct that are both clearer and more rational than those currently used to identify professional negligence."[52] The guidelines, Judge Koch wrote, "should not necessarily be viewed as conclusive evidence of the standard of care,"[53] but he conceded that "[t]hey can be extremely helpful in cases calling into question whether a physician chose the wrong course of diagnosis or treatment or should have gone further in attempting to understand or correct the situation."[54] At the very least, Judge Koch observed, these guidelines "are relevant to the question of the proper standard of care and should be admitted as substantive evidence if introduced through a witness who can lay a proper foundation."[55]

The only guidance gleanable from Mississippi caselaw[56] suggests that Mississippi courts are, under some circumstances, open to the idea of permitting expert witnesses to rely on clinical practice guidelines when enunciating a standard of care. Therefore, were this Court to hazard an *Erie* guess on the subject, it would follow Judge Koch's suggestions and find that Mississippi law permits expert witnesses to rely on clinical practice guidelines if the conduct prescribed by those guidelines does indeed describe the specific actions that would be taken by a minimally competent physician.

However, even under that standard, Conn could not defeat the Government's motion for summary judgment. Even if Dr. Strong had not failed to identify a specific Guidelines

---

[52] *Frakes*, 1997 WL 536949 at *6 (Koch, J., concurring).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Supra* at n.54.

publication, and even if he had not failed to identify a specific suggestion contained within such a

publication, he still would have failed to state that the conduct recommended by the Guidelines

marked the standard of care of a minimally competent physician. Therefore, this final piece of

Dr. Strong's report, like all other aspects of the report, fails to establish the objective standard of

care that the V.A. should have followed in treating Conn.

## CONCLUSION

Because Conn has failed to produce an expert report that establishes an objective standard

of care to which the V.A. should have adhered, he has failed to establish a *prima facie* case for

medical malpractice. Therefore, the Government's motion for summary judgment is granted. A

Final Judgment will be entered to memorialize this decision.

SO ORDERED this Twenty-Fourth day of July 2012.


/s/ *Carlton W. Reeves*

Hon. Carlton W. Reeves
United States District Court Judge